UNITED STATES of America ex rel. J. Russell HIXSON and Terrence D. Brown, Plaintiffs,

v.

HEALTH MANAGEMENT SYSTEMS, INC., ACS State Healthcare, LLC (f/k/a Consultec, Inc.), Kevin W. Concannon, and Eugene Gessow, Defendants.

No. 4:07–cv–0465–JAJ.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 21, 2009.

J. Russell Hixson, Hixson & Brown, PC, Clive, IA, pro se.

Terrence D. Brown, Hixson & Brown, PC, Clive, IA, pro se.

David M. Swinton, Belin Lamson McCormick Zumbach Flynn, P.C., Sheila M. Gowan, Diamond McCarthy LLP, New York, NY, for Defendant ACS State Healthcare, LLC.

Debra Lynne Hulett, Nyemaster Foode West Hansell & O'Brien PC, Des Moines, IA, Lorin M. Subar, Steve Sumner, Sumner Schick & Pace, Dallas, TX, David M. Swinton, Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, IA, for Defendant ACS State Healthcare, LLC.

Barbara E B Galloway, State of Iowa, Des Moines, IA, David M. Swinton, Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, IA, for Defendants Kevin W. Concannon and Eugene L. Gessow.

Maureen McGuire, U.S. Attorney's Office, Des Moines, IA, for United States of America.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to Defendants' March 27, 2009 Motion to Dismiss [Dkt. 28], as supplemented on June 16, 2009 [Dkt. 48]. Relators resisted Defendants' Motion to Dismiss on July 10, 2009 [Dkt. 54]. Defendants submitted a reply brief on July 28, 2009 [Dkt. 63]. Defendants' Motion to Dismiss is granted.

## I. MOTION TO DISMISS—THE LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege facts that, accepted as true, " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim for relief is facially plausible where the facts permit "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic* at 556, 127 S.Ct. 1955). This standard requires that factual allegations "raise a right to relief above the speculative level." *Bell Atlantic* at 555, 127 S.Ct. 1955 (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, 235–36 (3D ED.2004)). The plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic,* 550 U.S. at 563, 127 S.Ct. 1955.

The court "may not consider materials outside the pleadings." *Noble Sys. Corp. v. Alorica Cent., L.L.C.,* 543 F.3d 978, 982 (8th Cir.2008). When analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the court must accept as true all of the complaint's factual allegations and view them in the light most favorable to the plaintiff. *Id.; see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint" (citations omitted)). "The issue is not whether plaintiffs will ultimately prevail, but rather whether they are entitled to offer evidence in support of their claims." *U.S. v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (quotation marks omitted)).

## II. FACTUAL BACKGROUND

Relators J. Russell Hixson and Terrence D. Brown ("Relators") are attorneys who represent plaintiffs in medical malpractice cases in the State of Iowa. They are licensed to practice before this court. They allege that Defendants have violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), and (C) ("FCA") by failing to recover medical expenses paid by the Iowa Medicaid program when the expenses were necessitated by medical negligence.

Iowa's Medicaid system was originally operated under the umbrella of the Iowa Department of Human Services ("Iowa DHS"), but in recent years has been operated under the umbrella of the Iowa Medicaid Enterprise ("IME"). Federal Medicaid law requires states operating Medicaid programs to ascertain whether there is third party liability for costs paid for by Medicaid and to seek reimbursement for such costs. 42 U.S.C. § 1396a(a)(25)(A) and (B). These requirements are laid out in more detail in Medicaid's underlying regulations. 42 CFR § 433.137, § 433.139, § 433.140, and § 433.145. In 1987, the Iowa legislature adopted Iowa Code § 249A.6, which implemented federal law regarding a State's obligation to seek recovery of Medicaid benefits from liable third parties.

Iowa receives money from the federal government to assist it with its operation of Medicaid. This money, called Federal Financial Participation dollars ("FFP dollars"), is not available if Iowa fails to operate its State Medicaid plan in accordance with Medicaid regulations. 42 CFR § 433.138–140. Each State must submit certain forms requesting FFP dollars each quarter.

Defendants are various entities responsible for operating Iowa's Medicaid system, including two individuals. In 1989, Defendant Health Management Systems, Inc. ("HMS"), a New York corporation, became Iowa's Medicaid Third Party Liability contractor. In 2001, it issued a press release indicating it had been awarded contracts to perform "Third Party Liability, estate recovery," and other recovery services in Iowa for Iowa's Medicaid program. In 2003, Iowa DHS issued a Request for Proposals ("RFP") for third party liability and lien recovery services. In March of 2004, HMS, in response to the RFP, submitted a proposal to Iowa DHS. This proposal included a footnote indicating HMS's understanding that the current lien recovery contractor did not seek reimbursement in medical negligence cases. In July of 2004, Defendant HMS and Iowa DHS entered into a new contract in which HMS was to provide revenue collection service for the IME.

Defendant ACS State Healthcare, LLC (f/k/a Consultec, Inc.) ("ACS") is a foreign limited liability company. In July of 1996 its predecessor, Consultec, Inc., entered into a contract with Iowa DHS to perform, in part, third party liability and lien recovery work for Iowa Medicaid. In October of 1999, Consultec, Inc. was purchased by ACS.

Defendant Kevin W. Concannon ("Concannon") is the Director of Iowa DHS, and Defendant Eugene I. Gessow ("Gessow") is the Director of IME.

Federal Medicaid law requires Defendants to ascertain third party legal liability for medical expenses paid for by Medicaid and to seek reimbursement for such expenses. However, Defendants do not do so when the third party is a medical provider whose negligence necessitates subsequent medical treatment paid by Medicaid. Relators know that Defendants do not seek such reimbursement because they have experienced it in their clients' medical malpractice cases. In particular, Relators know that Defendants filed and withdrew

Medicaid liens in cases brought by Brooke Wilkins and Xander Leonard because Relators made a public records request for such information under Iowa Code § 22.2, Iowa's equivalent of the Freedom of Information Act.

In declining to seek reimbursement for Medicaid payments for expenses necessitated by medical malpractice, Defendants are following Iowa Code § 147.136 ("§ 147.136"), which abrogated the collateral source rule in Iowa in cases of medical negligence. Defendants interpret § 147.136 to prohibit reimbursement of medical malpractice damages.

Relators' legal theory is that when Defendants submit, or cause to be submitted, claims for FFP dollars to the federal government, without deducting overpayments resulting from Defendants' failure to seek reimbursement for treatment expenses necessitated by medical negligence, they are submitting false claims, and thus should incur liability under the FCA.

### III. SUBJECT MATTER JURISDICTION

The FCA provides that a court lacks jurisdiction if the action is based on allegations that have already been publicly disclosed. 31 U.S.C. § 3730(e)(4)(A). Here, the Defendants argue that the action is based on publicly disclosed information insofar as it is based on the following items:

1. Information regarding the filing and withdrawal of Medicaid liens in specific cases, obtained pursuant to a request under Iowa Code § 22.2, the state of Iowa's equivalent of the federal Freedom of Information Act

2. Iowa's interpretation of Iowa Code § 147.136, which was in the public domain in Defendant HMS's proposal provided to the state of Iowa in response to the RFP, which stated:

HMS is aware that the current lien recovery contractor does not recover in medical negligence cases. However, when several Medicaid members who were involved in medical negligence cases passed away, these cases rolled over to the HMS/SUMO estate recovery program. Upon further review with the Iowa Medicaid Director and the Attorney General's Office, the Medicaid Director authorized the estate recovery program director to proceed to litigate medical negligence recoveries in estate recovery matters and directed the Attorney General's Office to prepare and submit an amendment to Iowa Code 147.136 to except Medicaid recovery from the provisions of this law. Lien recovery in medical negligence matters will be reviewed further pending the outcome of the proposed legislation and the estate recovery litigation.

3. A publicly filed verdict form in a specific case.

The purpose of this limitation on jurisdiction is to "encourage private enforcement of suits by legitimate whistleblowers while barring suits by opportunistic *qui tam* plaintiffs who base their claims on matters that have been publicly disclosed by others." *Hays v. Hoffman*, 325 F.3d 982, 987 (8th Cir.2003). The FCA provides:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. 31 U.S.C. § 3730(e)(4)(A).

While this language has not made exactly clear which cases Congress intended to

bar, *see United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 681 (D.C.Cir.1997), *cert. denied,* 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997), it is clear that the jurisdictional inquiry turns on four questions:

> (1) whether the alleged "public disclosure" [was made by or in] one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the FCA; (3) whether the relator's complaint is "based upon" this "public disclosure"; and if so, (4) whether the relator qualifies as an "original source" under § 3730(e)(4)(B). *Hays,* 325 F.3d at 987 (quoting *United States ex rel. Holmes v. Consumer Ins. Group,* 318 F.3d 1199, 1203 (10th Cir. 2003) (en banc)).

The court will consider each question in turn.

### A. Whether the alleged "public disclosure" was made by or in one of the listed sources

■ Only public disclosures from one of the enumerated sources give rise to the jurisdictional bar. *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1513 n. 2 (8th Cir.1994), *cert. denied,* 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). The court will consider whether each of the three alleged disclosures came from one of the enumerated sources.

#### 1. The information obtained pursuant to Iowa Code § 22.2

■ The Relators' knowledge of the filing and then withdrawal of Medicaid liens in the cases of *Brooke Wilkins* and *Xander Leonard* comes from information received in response to Relator Hixson's Public Records Request under Iowa Code § 22.2. Defendants argue that such information constitutes publicly disclosed information in an "administrative report" or "administrative investigation" so as to invoke the FCA's jurisdictional bar. It is mostly set-

tled that information obtained pursuant to a request under the *federal* Freedom of Information Act is a public disclosure under the FCA, *see, e.g., United States ex rel. Reagan v. East Texas Medical Center Regional Healthcare,* 384 F.3d 168, 175–76 (5th Cir.2004); *United States ex rel. Mistick v. Hous. Auth. of the City of Pittsburgh,* 186 F.3d 376, 383 (3rd Cir.1999); *United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1049 (10th Cir.2004); *United States v. A.D. Roe Co., Inc.,* 186 F.3d 717, 723 (6th Cir.1999); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108–09, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (holding that information obtained in response to a FOIA request was a "public disclosure" for purposes of the Consumer Product Safety Act).

However, the issue here is a different one—namely, whether information obtained pursuant to a request made under a *state* equivalent to the federal FOIA constitutes information disclosed in an "administrative report" or "administrative investigation" for purposes of the FCA. The circuits to have considered this question have come to "different conclusions." *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.,* 528 F.3d 292, 301 (4th Cir.2008). The Ninth and Eleventh Circuits have concluded that state administrative reports and investigations constitute public disclosure for the purposes of the FCA. *United States ex rel. Bly–Magee v. Premo,* 470 F.3d 914, 919–19 (9th Cir.2006), *cert. denied,* —— U.S. ——, 128 S.Ct. 1119, 169 L.Ed.2d 948 (2008); *Battle v. Board of Regents,* 468 F.3d 755, 762 (11th Cir.2006). The Third Circuit came to the opposite conclusion via a textual analysis of the FCA. *United States ex rel. Dunleavy v. County of Del.,* 123 F.3d 734, 745 (3d Cir.1997). The court, noting that the terms "report, hearing, audit, or investigation" are modified by the words "congres-

sional, administrative, or Government Accounting Office", wrote that the words surrounding "administrative" referred to entities of the federal government. *Id.* at 745. Thus, based on the doctrine of *noscitur a sociis*,[1] the court concluded that § 3730(e)(4) only bars actions based on administrative reports that originate with the federal government. *Id.*

The Eighth Circuit rejected *Dunleavy's* textual approach, and said that reports prepared by state agencies that administer a federal program under significant federal regulation and involvement should qualify as public disclosures. *Hays,* 325 F.3d at 989. The Eighth Circuit disagreed with the Third Circuit's broad ruling that a state agency disclosure may never be an "administrative report" for purposes of § 3730(e)(4)(A). *Id.*

The question becomes whether the disclosures here—by Iowa DHS and IME to Relators concerning the filing and subsequent withdrawal of Medicaid liens—came from state agencies that administer a federal program under significant federal regulation and involvement. They did. DHS and IME administer Medicaid, which is not only a federal program under significant federal regulation, but also is the very program at issue in *Hays.* Therefore, the court finds that the information regarding the filing and withdrawal of Medicaid liens was publicly disclosed in a source enumerated in the FCA.

2. *The information in HMS's response to the RFP*

■ The parties agree that a state administrative hearing is a source identified in § 3730(e)(4)(A). The information contained in HMS's response to the Iowa RFP for the contract for the performance of Revenue Collection Service is part of a publicly filed document, because the Iowa RFP was part of an open bid process that was available for public review. That information qualifies as information disclosed at an administrative hearing, which, "for purposes of the public disclosure bar, encompasses publicly-filed documents, even if they are not the subject of a hearing." *A–1 Ambulance Services, Inc. v. State of California,* 202 F.3d 1238, 1243–44 (9th Cir.2000) (internal quotes and citations omitted). Therefore, the information in HMS's response to Iowa's RFP was publicly disclosed in a source enumerated in the FCA.

3. *The information in the publicly filed verdict form*

■ Defendants also argue that the information on which the suit is based was publicly disclosed in civil hearings—namely, via the publicly filed verdict form in the N.G. civil case, showing no category of damages assigned or received for past medical expenses. A publicly-filed verdict form as part of a civil hearing constitutes public disclosure by a source enumerated in the FCA, because it has been disclosed in a "civil hearing". 31 U.S.C. § 3730(e)(4)(A).

These disclosures are sufficient publication for the disclosures to be "public" within the meaning of the FCA. *See Hays,* 325 F.3d at 987.

**B. Whether the relator's complaint is "based upon" this "public disclosure"**

■ Defendants argue that Relators' action is "based upon" the above public disclosures, noting that Relators attach the information received in response to the public records request and the publicly filed verdict form to the complaint, and allege the information relating to the *Wilkins* and *Leonard* cases in the complaint.

Relators argue that the case cannot be based on those disclosures, because those

---

1. A word "gathers its meaning from the words around it."

disclosures do not rise to the level of "allegations or transactions" of the fraud, as required by the language of § 3730(e)(4)(A). The information that was publicly disclosed, Relators argue, did not contain the elements or the transactions necessary to infer fraud.

■ The dissemination of mere "information" that may relate to a fraudulent acquisition of federal funds is insufficient to invoke the public disclosure bar. The FCA "bars suits based on publicly disclosed 'allegations or transactions', not information." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 653–54 (D.C.Cir.1994) (citations and quotations omitted). The Eighth Circuit agreed with the D.C. Circuit's approach, saying "the bar is given effect when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1514 (8th Cir. 1994).

Relators argue that the publicly disclosed information did not contain the essential elements comprising the fraudulent transaction alleged, as required by *Rabushka.* Whether this is true requires brief discussion of the essential elements of the fraudulent transaction as alleged. Relators provide a ten-step process:

1. Iowa files a state Medicaid Plan that is approved by the federal government.
2. Iowa files a report with the federal government estimating what it expects to pay out in total Medicaid benefits in each quarter.
3. Federal Financial Participation dollars are received by the state of Iowa in accordance with the estimate provided by Iowa.
4. Iowa Medicaid dollars are utilized to pay for medical bills incurred by a Medicaid recipient as a result of medical negligence.
5. The Defendants learn or remain deliberately ignorant of a possible liable third party.
6. The Defendants do not assert a 249A.6(1) lien in medical negligence cases.
7. The Defendants do not assert a direct claim under 249A.6(6).
8. The State of Iowa retains the FFP dollars in spite of Defendants' failure to pursue a lien or direct claim.
9. Iowa receives additional Federal Financial Participation dollars with no overpayment deduction for the amounts that should have been repaid by liable medical malpractice tortfeasors.
10. Additional Medicaid dollars are utilized to pay for medical bills incurred by a Medicaid recipient as a result of medical negligence.[2]

The information received in response to the public records request, concerning the filing and withdrawal of Medicaid liens in specific cases, does not give rise to an inference of fraud, as it only disclosed specific instances of Paragraph 6 above, and none of the others. The information in the public verdict form similarly does not give rise to an inference of fraud.

The issue here, then, is whether HMS's comment in its response to Iowa's RFP—insofar as it contains Iowa's interpretation of Iowa Code 147.136 to bar recovery of Medicaid expenses in medical negligence cases—contained the "essential elements" of the fraudulent transaction. *Rabushka,* 40 F.3d at 1509.

Relators argue it does not, because Paragraphs 4, 5, and 8–10 above have not been disclosed.[3] Relators argue, in partic-

---

2. Relators' Brief in Support of Resistance to Defendants' Motion to Dismiss, pp. 19–20.

3. Relators also argue that Defendants contradict themselves by arguing on the one hand

ular, that Iowa's receipt of FFP dollars, without notifying the federal government of possible overpayment because of Iowa's interpretation of Iowa Code 147.136 (i.e., Paragraphs 8–10), is an essential element of the fraudulent transaction alleged. If there is a fraud claim here, the fact that FFP dollars were being received in purported violation of federal law is an essential element of that claim. Defendants point the court to no public disclosure of this element. If this element was publicly disclosed (i.e. if Paragraphs 8–10 were in the public domain), then Relators' recognition of the ten-step combination above as the grounds for an FCA claim would not prevent the public disclosure provision from barring this claim. *A–1 Ambulance*, 202 F.3d at 1245 ("A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been disclosed") (internal quotation and citation omitted).

Therefore, the court finds that the suit is not based upon any of the public disclosures, because the essential elements of the fraudulent transaction have not been disclosed. This does not stop Defendants from later producing evidence showing that such elements were in fact in the public domain, and thereby giving rise to the public disclosure bar to subject matter jurisdiction.

Because the court has found that the public disclosure bar does not apply, it need not consider whether the relators

qualify as an original source of the information on which the suit is based. *Hays*, 325 F.3d at 988.

## IV. FAILURE TO STATE A CLAIM

■ Relators allege that Defendants have violated three parts of the FCA. Defendants (I) have knowingly presented or caused to be presented to the United States a false or fraudulent claim for payment,[4] (ii) have knowingly made, used or caused to be used a false record or statement to get a false or fraudulent claim paid by the United States,[5] and (iii) have conspired to defraud the United States by getting false or fraudulent claims paid.[6] Relators allege that these took place via the ten-step process outlined above.

The FCA prohibits any person from knowingly presenting a false or fraudulent claim for payment or approval by the federal government. 31 U.S.C. § 3729(a)(1). To state a claim, Relators must allege three things: (1) the defendant has knowingly presented a claim or caused another to present a claim to the United States for payment or approval; (2) the claim was false or fraudulent; and (3) the defendant knew it was false or fraudulent. *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir.2002).

Defendants argue that (I) Relators fail to identify any claim submitted to the United States; (ii) Relators identify no false records or statements; (iii) Relators identify no facts to support their claims of conspiracy; and (iv) Relators fail to state

---

that they follow Iowa law, and on the other hand that the critical elements necessary to infer fraud were publicly disclosed. There is no contradiction here. The apparent contradiction stems from the fact that relators' theory of fraud liability here is rather novel, and requires the ten-step process outlined above, making the inference of fraud rather attenuated, and not obvious. Therefore, it is possible that Defendants follow Iowa law, and that the

critical elements necessary to infer fraud, on relators' novel theory—namely, all ten paragraphs above—were publicly disclosed.

4. In violation of 31 U.S.C. § 3729(a)(1)(A).

5. In violation of 31 U.S.C. § 3729(a)(1)(B).

6. In violation of 31 U.S.C. § 3729(a)(1)(C).

fraud with particularity as required by Federal Rule of Civil Procedure 9(b).

### A. Whether relators identify any claims submitted to the United States

A claim is defined as follows:

'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(a).

Defendants argue in their Motion to Dismiss that Relators do not identify any claims presented nor that any Defendant engaged in any affirmative acts to cause or assist the State of Iowa in the presentment of any claims to the United States for payment or approval.

Relators respond that the claims made are those for FFP dollars when reimbursement is not being sought by Defendants as required by federal law. To comply with federal law, Iowa's state plan must provide that it will comply with certain federal regulations. 42 CFR § 433.137. One of these regulations says that once the IME learns of a "liable third party" it must seek recovery of reimbursement within 60 days. 42 CFR § 433.139. If the IME fails to comply with this regulation—i.e., fails to seek recovery of reimbursement when it should—"FFP is not available". 42 CFR § 433.140.[7] Relators claim that Defendants failed to comply with this regulation,[8] and thus are not entitled to a certain amount of FFP dollars.

To enforce these provisions, the federal Center for Medicare & Medicaid Services ("CMS") uses two forms that states must use in connection with their FFP requests. The first is Form CMS–37, used by Iowa to make its initial FFP request each quarter to CMS. The "claims", then, that Relators allege, are these: the state of Iowa requests money from the federal government in connection with its compliance with federal law under the Medicaid scheme—more specifically, IME asks for FFP dollars to administer Medicaid. These requests fall within the statutory definition of "claim" as defined above, because they are requests (Form CMS–37) for money (FFP dollars) made to a grantee (CMS) for which the United States provides a portion (all) of the money provided.

■ The second form identified by Relators is Form CMS–64, which requires IME to certify what it actually did with the FFP dollars provided after it receives and spends those dollars in a given quar-

---

7. *See also West Virginia v. U.S. Department of Health & Human Services*, 289 F.3d 281, 284 (4th Cir.2002) ("If a state elects to participate in the Medicaid program, it must submit a Medicaid plan to HHS for approval. If the plan is approved by HHS, the state is then entitled to reimbursement from the federal government of a certain percentage of the costs of providing medical care to eligible individuals—the "Federal medical assistance percentage" ("FMAP"). 42 U.S.C.A. § 1396b(a)(1). If a state fails to comply with the requirements imposed by the Medicaid Act or by HHS, the state risks the loss of all or a part of its FMAP. *See* 42 U.S.C.A. § 1396c.").

8. Relators allege that Defendants failed to "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services under [Medicaid] ...; [and] that in any case where such legal liability is found to exist after medical assistance has been made available ... [to] seek reimbursement for such assistance to the extent of such legal liability." *Amended Complaint* at para. 12.

ter. In Form CMS–64, IME certifies that the FFP dollars were used in compliance with federal law. If IME fails to recover reimbursement from tortfeasors that it should be recovering, then it should be deducting from its FFP requests any overpayments because of a failure to collect more money. The failure to deduct overpayment itself does not constitute a "claim" under the FCA, because this failure itself is not a request or demand for money. 31 U.S.C. § 3729(b)(2). But this type of form could conceivably be a "statement material to a false or fraudulent claim". *See* 31 U.S.C. § 3729(a)(1)(B).

■ The third type of "claim" Relators identify is Defendants HMS and ACS's invoices that Relators allege were submitted directly to the federal government for payment for their services. As these would be demands for money under a contract, they fall within the statutory definition of a claim. The court doubts whether these demands were in fact submitted directly to the United States government, as alleged in the complaint, or, rather, were only submitted to DHS, given the contracts between DHS and Defendants (and an apparent lack of any contract directly between Defendants and the United States). While the court doubts that Relators could survive summary judgment on this point, they identify a "claim"—a request for money—for purposes of the FCA, adequately enough to survive a motion to dismiss.

### B. Whether Relators identify any "false" records or statements

■ While Relators do identify claims for money submitted to the United States for which Defendants are arguably responsible, the heart of this case is whether any

of those claims are "false" under the False Claims Act.

Defendants argue that none of the claims Relators identify are false. As noted above, the claims are based on Defendants' failure to seek recovery for money paid by Medicaid for treatment made necessary by medical negligence. In not seeking such recovery, Defendants argue, they were just following the law—both Iowa and federal—because state law, Iowa Code § 147.136, prohibits recovery of medical expenses in medical negligence cases. If Defendants were in fact following federal and state law, Relators concede, no false claims for FFP dollars were being made by the Defendants.[9]

■ Iowa Code § 147.136 provides:

In an action for damages for personal injury against a physician [or other medical provider] ... based on the alleged negligence of the practitioner ... in which liability is admitted or established, the damages awarded shall not include actual economic losses incurred or to be incurred in the future by the claimant by reason of the personal injury ... to the extent that those losses are replaced or are indemnified by insurance, or by governmental, employment, or service benefit programs or from any other source except the assets of the claimant or the members of the claimant's immediate family. Iowa Code § 147.136.

This statute was enacted in 1975 to abrogate the collateral source rule for medical malpractice claims. The intent was to help assure continued health care services at affordable rates. *Heine v. Allen Memorial Hosp. Corp.*, 549 N.W.2d 821, 823 (Iowa 1996); *Lambert v. Sisters of Mercy Health Corp.*, 369 N.W.2d 417, 424 (Iowa 1985).

**9.** *See* Relators' Brief in Support of Relators' Resistance to Defendants' Motion to Dismiss, n. 51.

Under § 147.136, a medical negligence defendant need not pay damages for the cost of medical expenses incurred as a result of the negligence to the extent that those expenses are replaced by another source.

Relators allege that Defendants violated federal Medicaid law, 42 U.S.C. § 1396a(a)(25)(A) and its underlying regulations, which oblige Iowa, when paying a patient's costs through Medicaid, to locate anyone who is liable for those costs—a "liable third party"—and seek reimbursement from that party. 42 U.S.C. § 1396a(a)(25)(A). That section provides that the state administering a Medicaid plan "will take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan ..." *Id.* The next section requires the State to "seek reimbursement for such assistance to the extent of such legal liability." 42 U.S.C. § 1396a(a)(25)(B). Relators allege that Defendants failed to do this by not seeking reimbursement from medical negligence defendants whose negligence required the treatment covered by Medicaid.

■■■ However, the federal regulations do not directly require Defendants to seek reimbursement from medical negligence defendants *per se.* Rather, they require Iowa to seek reimbursement from those parties that are liable under existing state tort law. Section 1396a(a)(25)(A) requires Iowa to look to legal responsibilities that exist independently of the federal regulations—namely, in existing state tort law— to administer Medicaid in accordance with federal law and regulations. As one federal court has said, the language of the statute "shows the congressional intent rather plainly to have been to commit the collection [of costs paid by Medicaid from liable third parties] ... to those remedies available for such purposes under state law." *Com. of Mass. v. Philip Morris, Inc.,* 942 F.Supp. 690, 696 (D.Mass.1996).[10]

Relators make two arguments concerning the interaction of § 147.136 and the federal law of Medicaid—in particular, 42 U.S.C. § 1396a(a)(25)(A)—that the court will address in turn. First, Relators argue, § 147.136 does not apply to medical costs paid by Medicaid because Medicaid benefits do not "replace" those costs for the purposes of § 147.136. Second, if § 147.136 does apply to bar recovery of costs paid for by Medicaid, it is preempted by the federal law of Medicaid.

1. *Whether § 147.136 applies to Medicaid*

■■■ Relators argue that § 147.136 does not apply to Medicaid payments, because such payments are not benefits of a governmental program that "replace" losses suffered at the hands of a third party tortfeasor. In making this argument, Relators rely on an Iowa trial court ruling and several out-of-state appellate court cases construing various state statutes abrogating the respective state's collateral source rule.

Relators point to an Iowa district court probate ruling which held on an estate claim that Medicaid funds are not insurance, nor are they paid under a governmental benefit program so as to fall within the medical malpractice damages limita-

---

**10.** Put another way, § 1396a(a)(25)(A) does not require Iowa to legislate certain kinds of third party liability. Rather, it only requires that Iowa ascertain and enforce liability based on pre-existing state tort or contract law. Whether Congress could require Iowa to legislate certain kinds of tort law is a larger constitutional issue that the court will not discuss here. *See New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (discussing Tenth Amendment's limit on power of Congress to compel states to adopt legislation, and finding that Congress may attach conditions to receipt of federal funds in certain circumstances).

tion of § 147.136. *Ables Estate*, Iowa District Court for Polk County, Probate No. ES–49361. The court there held that "Medicaid is, in substance, a loan to be repaid from the decedent's estate ..." *Id.* If Medicaid benefits do not "replace" the tortfeasor's liability to pay medical benefits or if the applicable statutes create a "debt" that is required to be paid out of the "assets of the claimant", then § 147.136 is inapplicable.

Defendants argue that the *Ables Estate* holding does not apply here because it was an estate recovery case, not a third-party liability case.[11] Iowa has different obligations with respect to estate recovery on the one hand and enforcement of third-party liability on the other. Estate recovery is the recovery of correctly paid Medicaid benefits from a Medicaid recipient's estate, which is permitted as an exception to the general prohibition against the recovery of correctly paid Medicaid benefits. 42 U.S.C. § 1396p(a)-(b). In contrast, the enforcement of third-party liability is the State seeking reimbursement of paid medical expenses from liable third parties. *Id.* at § 1396a(a)(25)(A) (the State administering Medicaid "will take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan").

■ This is not a distinction without a difference. First, it is clear from the statutory language that liens on a person's property cannot be imposed to recover Medicaid payments for that person while she is still alive, except in certain circumstances not relevant here. *See* 42 U.S.C. 1396p(a) ("No lien may be imposed against the property of any individual prior to his death on account of medical assistance

paid or to be paid on his behalf under the State plan ...."). Moreover, it is understandable that Congress would draw a distinction in the status of Medicaid depending on whether the benefitting patient is alive or dead—considering Medicaid a loan to be repaid when the patient is dead and a payment replacing medical costs when the patient is alive—to ensure both that living patients are not deprived of their homes or means of sustenance because of medical costs, and that survivors do not reap a windfall inheritance at Medicaid's expense.

Relators also rely on cases from other states for the proposition that Iowa's statute abrogating the collateral source rule should be construed to exclude Medicaid payments. Indeed, this argument has apparent strength in that every other state court to consider a similar issue has found that its own state statute abrogating the collateral source rule does not apply to Medicaid payments. However, none of the various state courts' approaches apply here.

In *Brown v. Stewart*, the California Court of Appeal held that Medicaid payments did not fall within the scope of Cal. Civ.Code § 3333.1, enacted in 1975 to abrogate the collateral source rule in California. *Brown v. Stewart*, 129 Cal.App.3d 331, 337, 181 Cal.Rptr. 112 (Cal.Ct.App. 1982). However, the California court expressly relied on parts of the California statute that are narrower than Iowa Code § 147.136, including its limitation to amounts "payable as a benefit to the plaintiff" to find that Medicaid payments in California, paid directly to service providers, were not covered by the statute. *Id.*

11. This argument of Defendants' applies equally to distinguish the reasoning in *Mohammed v. Otoadese*, 725 N.W.2d 658 (Iowa App.2006) (*reversed on other grounds, Mohammed v. Otoadese*, 738 N.W.2d 628 (Iowa

2007)), in which the court upheld a jury instruction that the decedent's estate would have to pay back Medicaid out of any amount awarded.

The language of Iowa Code § 147.136 contains no such limitation—it does not cover only those payments payable to the patient directly.

In *Harlow v. Chin*, the Massachusetts Supreme Judicial Court interpreted the Massachusetts statute abrogating the collateral source rule to exclude Medicaid payments, but only because that statute contained an exception for benefits provided by an entity "whose right of subrogation is based in any federal law." *Harlow v. Chin*, 405 Mass. 697, 545 N.E.2d 602, 609–11 (1989) (quoting Mass.Gen.Laws. ch. 231, § 60G(c)). No such exception exists in the Iowa statute, and thus even though the State of Iowa's right of subrogation to damages obtained by plaintiffs who received Medicaid from third-party tortfeasors is arguably based in federal law (42 CFR § 433.145, "Assignment of rights to benefits—State plan requirements"),[12] the Iowa statute still covers Medicaid payments.

In *Hughlett v. SC Health Corp.*, the Tennessee Court of Appeals held that a Tennessee statute abrogating the collateral source rule, with language very similar to that in Iowa Code § 147.136, did not apply to Medicaid payments. *Hughlett v. Shelby County Health Care Corp.*, 940 S.W.2d 571 (Tenn.Ct.App.1996). The court relied on a Tennessee Supreme Court decision holding that workers' compensation was not within the scope of the statute, to conclude that Medicaid also was not within the scope of the statute. *Id.* at 573–74. But the Iowa Supreme Court has reached the opposite result with respect to the Iowa statute, holding that § 147.136 does not exclude workers' compensation. *Toomey v. Surgical Servs., P.C.*, 558 N.W.2d 166 (Iowa 1997). Therefore, the

Tennessee case also fails to provide guidance in interpreting the Iowa statute.

The New Jersey Supreme Court came to the same conclusion in *Lusby By and Through Nichols v. Hitchner*, 273 N.J.Super. 578, 642 A.2d 1055 (N.J.Super.Ct.App.Div.1994) (NJ statute abolishing collateral source rule does not apply to reimbursable benefits paid by Medicaid). However, the court there relied heavily on the fact that the statutory purpose of the New Jersey statute—preventing a claimant from getting a windfall—would not be advanced by applying the statute where a plaintiff could not get a double recovery because her entire recovery would be subject to Medicaid's reimbursement rights anyway. *Id.* at 591, 642 A.2d 1055. Significantly, the statutory purpose of Iowa Code § 147.136 is different—namely, to avert the medical malpractice crisis that threatened access to any health care as malpractice insurance became prohibitively expensive. *See Lambert*, 369 N.W.2d at 424. This purpose—in contrast to the purpose of the New Jersey statute—*is* advanced by applying the statute to shift certain burdens from medical negligence defendants to States administering Medicaid. While the legislative determination to make this shift may seem ripe for reform in light of the public debate concerning the cost of Medicaid programs, any such reform to the statute abrogating the collateral source rule—at least in Iowa—must be legislative.

The court finds that Medicaid payments are within the scope of the language in § 147.136 concerning replacement of medical costs by governmental benefit programs.

---

**12.** It is also arguably based in state law, insofar as Iowa Code § 249A implements this federal regulation in Iowa.

*2. Whether § 147.136, as applied to Medicaid, is pre-empted by federal law*

▆ Defendants have argued that they were following both federal Medicaid regulations and § 147.136 in not pursuing reimbursement for costs paid by Medicaid and incurred because of medical negligence, because Medicaid regulations only require ascertaining legal liability under state tort law, and under § 147.136 there is no legal liability to ascertain in such cases. Relators counter that if § 147.136 is interpreted to apply to Medicaid, it must be preempted by the federal law of Medicaid.

▆ Under the doctrine of preemption, state laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are preempted. *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (citations omitted). "Where Congress has not expressly preempted or entirely displaced state regulation in a specific field, as with the Medicaid Act, 'state law is preempted to the extent that it actually conflicts with federal law.'" *Lankford v. Sherman,* 451 F.3d 496, 510 (8th Cir.2006) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). There is an actual conflict between state and federal law where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted); *see also Hankins v. Finnel,* 964 F.2d 853, 861 (8th Cir.1992). In the context of Medicaid, if the state decides to participate in Medicaid, its program "must comply with all federal statutory and regulatory requirements." *Id.* (citations omitted); *see also Atkins v. Rivera,* 477 U.S. 154, 156, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986) (noting participating states are obligated to comply with requirements of Social Security Act to receive federal funding).

Relators argue that if § 147.136 is construed to apply to Medicaid payments, it stands as an obstacle to the accomplishment of the full purposes of Congress. Congress intended to make Medicaid a "payor of last resort". *See Norwest Bank of North Dakota, N.A. v. Doth,* 159 F.3d 328, 333 (8th Cir.1998) (discussing § 1396k design "to maximize the effectiveness of [the Medicaid Act] by ensuring Medicaid as a payor of last resort"); *see also New York State Dept. of Social Services v. Bowen,* 846 F.2d 129 (2d Cir.1988); *Barton v. Summers,* 293 F.3d 944, 951–52 (6th Cir. 2002) (stating the purpose of 42 U.S.C. § 1396a(a)(25) as requiring states to "attempt to recover medical costs incurred under Medicaid programs from responsible third parties, rather than relying on federal aid exclusively"). Relators argue that if § 147.136 prevents Iowa from seeking reimbursement of Medicaid payments for treatment necessitated by medical negligence, as Defendants assert, then it vitiates Medicaid's status as a payor of last resort, because it has the effect of placing a medical tortfeasor and its insurer "secondary" to Medicaid. If the state law has the effect of making Medicaid something other than a "payor of last resort", then it stands as an obstacle to the accomplishment of Congress's purpose, and there is an actual conflict between state and federal law and the state law is preempted.

The issue, then, is whether § 147.136 makes Medicaid something other than a "payor of last resort". It does not. For Medicaid to be the payor of last resort, "other available resources must be used before Medicaid pays for the care of an individual enrolled in the Medicaid program." *New York State Dept. of Social Services v. Bowen,* 846 F.2d 129, 133 (2d Cir.1988) (quoting S.Rep. No. 146, 99th

Cong., 2d Sess. 1, 312, *reprinted in* 1986 U.S.Code Cong. & Admin. News 42, 279). The question boils down to whether there are any "other available resources" to pay for medical costs where those costs are necessitated by medical malpractice. Defendants argue that the answer must be no, because § 147.136, in setting out Iowa's state tort law, defines what available resources there are, and excludes damages where they are replaced by another source.

Defendants are right. When someone eligible for Medicaid gets hurt by medical negligence, and incurs costs for subsequent treatment, those costs are paid by Medicaid. Once these costs are paid by Medicaid, § 147.136 says there is no liability by medical practitioners for damages covered by Medicaid. Federal Medicaid law does not require anything more than ascertaining and enforcing liability for certain damages, and in this situation, there simply is no liability to ascertain under state law for these damages. *See Philip Morris, Inc.,* 942 F.Supp. at 696.

Section 147.136, then, does not make Medicaid something other than a "payor of last resort", because there are no "other available resources" that are left fallow before—or after—Medicaid is used to pay for the care of an individual enrolled in Medicaid. *See Bowen,* 846 F.2d at 133.

The court concludes that the statutes do not conflict. Therefore, Defendants are not required to seek reimbursement for Medicaid payments for costs necessitated by medical negligence, as § 147.136 precludes the recovery of damages in such cases. Therefore, claims for money from the federal government by IME and Iowa DHS in accordance with a Medicaid state plan operating under this interpretation of § 147.136 are not false.

3. *Regardless whether § 147.136 applies to Medicaid payments or Medicaid law preempts § 147.136, Defendants' claims were not false*

■■ Even if Medicaid law preempts § 147.136, Defendants' claims here—i.e., their requests for FFP dollars from the federal government—were not false.[13] As the above discussion shows, the issue of whether Medicaid law preempts § 147.136 is a complex one. It would be a reasonable interpretation of the coexistence of Medicaid law and § 147.136 to conclude that Defendants were not legally obligated to seek reimbursement for medical costs paid by Medicaid necessitated by medical malpractice. Because Defendants' claims were based on a reasonable interpretation of the regulatory requirements, their claims cannot be said to be "false" under the FCA. Indeed, "the lack of clarity regarding the proper interpretation of the regulations indicates that no basis exists for imposing FCA liability on Defendants, who merely adopted a reasonable interpretation of regulatory requirements". *United States v. Sodexho, Inc.,* 2009 WL 579380 (E.D.Penn, March 6, 2009). *See also Lamers,* 168 F.3d at 1018 ("[I]mprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA.").

■■ The FCA requires that defendants make false claims "knowingly" by (1) having actual knowledge of falsity of the claims, (2) acting in deliberate ignorance of

---

**13.** Here the court is addressing the question of the falsity of the claims as well as the defendant's knowledge of the falsity of the claims. As the Seventh Circuit has said, "it is impossible to meaningfully discuss falsity without implicating the knowledge requirement." *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999).

the falsity of the claims, or (3) acting in reckless disregard of the falsity of the claims. 31 U.S.C. § 3729(b). Here, Defendants acted according to a plausible interpretation of the law that no court had ever contradicted. While the interaction of Medicaid law and § 147.136 creates an ambiguity in who should pay, acting according to a reasonable interpretation of that ambiguity does not qualify as knowing or reckless disregard for falsity under the FCA. *See United States ex rel. K & R Ltd. P'ship v. Mass. Housing Fin. Agency,* 530 F.3d 980 (D.C.Cir.2008) (affirming summary judgment on relator's FCA claim where allegation of fraud depended on interpretation of ambiguous mortgage note and both parties interpretations were plausible); *cf. Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 70, n. 20, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) (noting, in the context of the Fair Credit Reporting Act, that "[w]here ... the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one interpretation as a knowing or reckless violator").[14]

Therefore, the court finds that Defendants did not make any false claims. Since Relators fail to identify any false claims, they also fail to allege a claim of conspiracy to present false claims. Because Relators have not alleged false claims, relators *a fortiori* have not stated fraud with enough particularity to satisfy Federal Rule of Civil Procedure 9(b).

## V. "PERSONS" UNDER THE FCA AND THE ELEVENTH AMENDMENT

Defendants argue that, while Relators allege that Defendants Concannon and Gessow are sued in their individual capacities, these defendants are actually sued in their official capacities, because they are sued for actions taken in the course of their official duties. If they are sued in their official capacities, then the suit should be barred for two reasons, Defendants argue.

■ First, a state employee acting in his official capacity is not a "person" under the FCA. *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa Dep't of Human Servs.,* 269 F.3d 932, 936 (8th Cir.2001) ("a state employee sued for money damages for actions taken in an official capacity stands in the shoes of the sovereign and is not a person under the FCA") (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 788, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) and *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Therefore, if Concannon and Gessow are sued in their official capacities, then they are not persons under the FCA, and relators fail to state a claim against them upon which relief can be granted. Second, defendants argue that claims against state employees acting in their official capacity are barred by the Eleventh Amendment.

Relators argue that Concannon and Gessow are sued in their individual capacities, and thus they are persons subject to liabil-

---

**14.** Relators also imply in a footnote that there is evidence of subjective bad faith, at least on the part of Defendant HMS, because it was in HMS's best interest to interpret § 147.136 to include Medicaid because it is paid a flat fee for its lien recovery services (whereas it gets a 7.5 % contingency fee to collect money via "Estate Recovery", and it interprets § 147.136 to exclude Medicaid in this context). However, where Defendants have "followed an interpretation that could reasonably have found support in the courts," they cannot be found to be making knowingly or recklessly false claims, "whatever their subjective intent may have been." *Burr,* 551 U.S. at 70, n. 20, 127 S.Ct. 2201.

ity under the FCA and the suit is not barred by the Eleventh Amendment.

The issue for the court to decide, then, is whether Concannon and Gessow may be liable for money damages in their individual capacities. Relators' assertion that these defendants are sued in their individual capacities is not enough. "In determining whether a state official may be liable for money damages in his individual capacity, courts should not rely wholly on 'the elementary mechanics of captions and pleading.'" *Gaudineer*, 269 F.3d at 937 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)). "We should look at whether the alleged conduct of the defendant was 'outside of [his] official duties.'" *Id.* (quoting *Bly–Magee v. California*, 236 F.3d 1014,1016 (9th Cir.2001)).

Defendants argue that the facts pleaded by Relators in their complaint, if true, would not show that they acted outside their official duties. Relators essentially allege that Concannon and Gessow engaged in behavior that relators believe violated federal law. The issue is whether this allegation, if true, would be enough to show that Concannon and Gessow acted outside their official duties. It is not.

Relators' complaint alleges that the individual defendants were required to comply with federal law, and specifically alleges how they violated it by waiving Iowa's lien rights in medical negligence cases. Moreover, Relators argue, unlike in *Gaudineer*, the complaint alleges that the individual defendants here were not implementing a state policy. If the court

agreed with these contentions—i.e. that the complaint alleges violations of state and federal law carried out by individual officials not pursuant to any state policy—then it would have no trouble finding that the allegations were sufficient to show the individual defendants acted outside their official duties. Action in violation of valid federal law is necessarily beyond the scope of any official authority. *Ex parte Young*, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

However, the truth of those contentions is not obvious. Here, Relators allege behavior for which there is a colorable basis in both state and federal law, as the above discussion of § 147.136 makes clear. There is no factual allegation supporting the Relators' bare legal conclusion that Concannon and Gessow were acting outside their official duties, not pursuant to state policy. To the contrary, according to the complaint, Relators' allegations arise out of Iowa's administration of the federal program of Medicaid, and the individual defendants' apparent role in that administration. The individual defendants appear to have been acting pursuant to a perfectly plausible interpretation of both federal and state law. Assuming everything the Relators allege is true, it does not appear that the individual defendants acted outside their official duties.

Because Relators have not sufficiently alleged that the individual defendants were acting outside their official duties, those defendants are not persons for purposes of the FCA. *Gaudineer*, 269 F.3d at 937. Relators, then, have failed to state a claim against these defendants upon which relief can be granted.[15]

15. Relators further argue that *Gaudineer* itself is no longer good law, because of the Ninth Circuit's decision in *Stoner v. Clara County Office of Educ.*, 502 F.3d 1116 (9th Cir.2007), holding that state employees *may* be sued in their individual capacities under the FCA for actions taken in the course of their official duties. While the court in *Stoner* clearly disa-

greed with the Eighth Circuit in *Gaudineer*, see *Stoner*, 502 F.3d at 1125, *Gaudineer's* holding that state officials cannot be sued under the FCA in their individual capacity unless they were acting outside their official duties is still controlling law in this Circuit. The Supreme Court's decision in *Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 116

If Relators only allege actions taken by individual defendants in the course of their official duties, then the action is really against the State. *Graham,* 473 U.S. at 165, 105 S.Ct. 3099. The Supreme Court has left open the question whether an action by a *qui tam* relator against a State would run afoul of the Eleventh Amendment. *Stevens,* 529 U.S. at 787, 120 S.Ct. 1858. The court need not address this issue to resolve this case.

## VI. STANDING

 Defendants argue that Relators lack standing to bring a *qui tam* action under the FCA because they are *pro se.* Section 1654, Title 28, the general provision permitting parties to proceed *pro se,* provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654. The provision only provides a right to conduct a party's own cases, with no right to represent the interests of others. In an FCA action, the injury belongs to the United States, which is the real party in interest. *Stevens,* 529 U.S. at 774–75, 120 S.Ct. 1858. Therefore, relators cannot have authority under 28 U.S.C. § 1654 to proceed *pro se* in this *qui tam* action.

The FCA is silent as to whether a private individual can bring a *qui tam* suit *pro se, see* 31 U.S.C. §§ 3729–3733, so there is no explicit statutory authority for such an action in the FCA either.

 It is clear that *pro se,* nonlawyer relators lack standing to prosecute *qui tam* actions. *United States ex rel. Mergent Services v. Flaherty,* 540 F.3d 89 (2nd Cir.2008); *Timson v. Sampson,* 518 F.3d 870, 873–74 (11th Cir.2008) (*per curiam*); *United States ex rel. Lu v. Ou,* 368 F.3d

773, 775–76 (7th Cir.2004); *United States v. Onan,* 190 F.2d 1, 6 (8th Cir.1951). The only issue here is whether the fact that Relators here are lawyers admitted to practice before this court is a distinction that means they can proceed *pro se* in a *qui tam* action under the FCA.

One of the most important concerns in each of the cases cited above prohibiting *pro se* relators from bringing *qui tam* actions under the FCA was the quality of representation that would ultimately bind the United States, the party with the real interest at stake. Indeed, the Eighth Circuit said Congress could not have "intended to authorize a layman to carry on such suit as attorney for the United States" and said it was "unthinkable that Congress by this Act intended to license laymen to practice law." *Onan,* 190 F.2d at 6. Clearly those concerns are not present here, where relators are lawyers licensed to practice before this court.

The Ninth Circuit in *Stoner* considered whether an attorney can bring a *qui tam* action under the FCA *pro se. Stoner,* 502 F.3d at 1125–28. The court there followed the analysis of the cases above, holding that neither 28 U.S.C. § 1654 nor the FCA authorize such a relator to prosecute an FCA action *pro se. Id.* However, the court implied that if the attorney-relator there could obtain *pro hac vice* admission in the court where the action was brought, he could bring the case. *Id.* at 1128.

Clearly the courts have been reluctant to allow *pro se* prosecution of *qui tam* actions under the FCA. But where the relators are attorneys licensed to practice law before the court where the action is brought, the reasons for reluctance disappear. Looking to the rationale of the cases Defendants cite, the court finds no reason to prohibit relators from proceed-

L.Ed.2d 301 (1991) did not overrule *Gaudi-* *neer's* holding specific to the FCA.

ing *pro se.* While the Second Circuit in *Flaherty* reached its holding that relators are not entitled to proceed *pro se* as a matter of statutory construction, absent any reliance on the concern about quality of representation, *Flaherty,* 540 F.3d at 94, the Ninth Circuit saw no reason to prohibit the relator from proceeding *pro se* if he was licensed to practice law before the court in which the case was brought. *Stoner,* 502 F.3d at 1128.

Therefore, the court finds that Relators can bring the action *pro se.*

Upon the foregoing,

**IT IS SO ORDERED** that Defendants' Motions to Dismiss [Dkts. 28 & 48] are granted and this case is dismissed in its entirety. The clerk shall enter judgment accordingly.